***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Phillips and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence, the Full Commission reverses the Deputy Commissioner's denial of benefits and enters the following Opinion and Award.
 *********** EVIDENTIARY RULING
All objections raised by counsel at the deposition are ruled upon in accordance with the applicable provisions of law and in accordance with the decision rendered in this case.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. All parties have been properly designated and that there is no question as to misjoinder or nonjoinder of parties.
3. Gallagher Bassett Services, Inc., was the Third-Party Administrator for The Hartford Insurance Company, who was the carrier for Sonic Drive-In.
4. On or about December 12, 2001, and March 10, 2002, plaintiff was employed by Sonic Drive-In.
5. The Form 22 submitted by defendants in this case indicates that plaintiff had an average weekly wage of $372.96, which yields a compensation rate of $248.64.
 ***********
Based upon the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. Plaintiff was employed as an assistant manager and maintenance person for Sonic Drive-In at all pertinent times. Holly Mizell, plaintiff's wife, was the owner/operator of the Sonic Drive-In location at which plaintiff worked at the time of his injuries. Holly Mizell was plaintiff's supervisor and was the senior manager at that site.
2. The first notice of this claim to the insurance carrier was a Form 19 prepared by the third-party administrator based upon information supplied by Holly Mizell in her capacity as plaintiff's supervisor. The Form 19, dated April 8, 2002, stated that on March 10, 2002, plaintiff injured his left shoulder when he slipped on some grease at work and that his disability began on April 5, 2002. Holly Mizell testified, and the Full Commission finds as fact, that she reported to the third-party administrator that the fall on the grease occurred December 12, 2001, and that plaintiff re-injured his arm on March 10, 2002, and again on April 4, 2002.
3. The second notice to the carrier was a Form 18 in which plaintiff's former lawyer stated that plaintiff sustained injuries when he slipped on some grease at work on December 12, 2001. The Form 18 indicated that plaintiff's date of disability was to be determined.
4. The third-party administrator filed with the Industrial Commission a Form 63, Notice To Employee Of Payment Of Compensation Without Prejudice, dated May 31, 2002. This form indicated that it was filed with respect to claims for injury on December 12, 2001, and March 10, 2002. It also indicated that the employer first had written or actual notice of the injury on March 10, 2002. Thereafter, plaintiff began receiving benefits based on an average weekly wage of $400.00, which yielded a compensation rate of $266.66. The Form 63 further indicated that plaintiff's disability did not begin until April 22, 2002. Plaintiff stated in his verified discovery responses that he received four checks, each in the amount of $266.66, and one check in the amount of $533.66 that was subsequently dishonored.
5. The third-party administrator filed with the Industrial Commission a Form 61, Denial of Workers Compensation Claim, dated June 20, 2002, stating that it was denying plaintiff's claim for injury of March 10, 2001(sic). Reasons given for the denial were:
— employee was not injured as a result of his employment
 — the incident described by the employee is not the proximate cause of the alleged injury
 — the employee failed to give proper notice of the alleged injury to the employer
 — employer/administrator reserves the right to use all other available defenses
6. Plaintiff testified, and the Full Commission finds as fact, that at a shift change on December 12, 2001, he went out of the restaurant to "get everybody to come back and so we can start getting everybody out of the store." Two employees had been horsing around and had spilled a bucket of grease near the dumpster. Plaintiff rounded the corner, slipped on the grease, and landed hard on his left shoulder. Holly Mizell and Kyniegel Maynor helped plaintiff to his feet. Holly Mizell told plaintiff to go home, put a heating pad on his shoulder, and take some Aleve. When the pain did not go away, Holly Mizell made an appointment for plaintiff on December 21, 2001, with Primary Care Plus. The medical record from that visit gave a history that plaintiff fell onto his left shoulder about two weeks before the visit and had been in pain ever since. An X-ray taken that day did not reveal any broken bones. Plaintiff was given a prescription for Darvocet for his pain. Holly Mizell directed plaintiff to tell Primary Care Plus to charge the visit to defendant-employer's health policy.
7. Holly Mizell testified, and the Full Commission finds as fact, that she was present on December 12, 2001, when Plaintiff slipped on the grease and fell hard on his left shoulder. Initially, she did not report it as a workers compensation injury for fear that it might affect premium costs. On Sunday, March 10, 2002, Holly Mizell directed Plaintiff to repair the exhaust system at the store. When Plaintiff returned home from that chore, he reported that he had reinjured the shoulder. On April 4, 2002, when Plaintiff re-injured his left shoulder carrying boxes into the cooler, Holly Mizell took him to the emergency room. After returning to the store from dropping him off, she reported the incident to the third-party administrator. She reported it as a reinjury of injuries that had originally occurred on December 12, 2001, and March 10, 2002.
8. The emergency room records of April 4, 2002, quote plaintiff as reporting that he fell onto his shoulder several months prior to that date, was seen at urgent care, diagnosed with a "bone bruise," he had no treatment other than at urgent care, the pain to his shoulder and arm had continued since his original injury, and his pain was no longer controlled by over-the-counter medicine. It also recorded that he presented on this occasion with left shoulder pain and said he was lifting a box and his shoulder just gave out. The emergency room X-ray report stated:
 "Two views of the left shoulder were obtained and demonstrate no fractures or subluxation. There is subchrondal erosion involving the distal aspect of the clavicle. That may be due to post dramatic osteolysis or degenerative changes. Clinical correlation recommended."
The emergency room physician referred Plaintiff to Dr. Robert Carlson, an orthopedic surgeon with Cape Fear Orthopaedic Clinic in Fayetteville for follow up.
9. Plaintiff presented to Dr. Carlson on April 10, 2002, gave a history of slipping on grease, landing hard on his left shoulder, and suffering pain from this incident for the past four months. He was diagnosed with AC joint sprain and distal clavicle osteolysis. Plaintiff was given the option of learning to live with the pain or having surgery. He chose surgery and underwent a distal clavicle excision on July 18, 2002. He continues to treat with Dr. Carlson.
10. As a result of his visit to the emergency room April 4, 2002, plaintiff was put on work restrictions for three days. Later, Dr. Carlson limited plaintiff to one-arm duty and later wrote him out of work completely pending surgery and recovery.
11. As a result of his compensable injuries, plaintiff was unable to earn wages for various periods of time after December 21, 2001. Plaintiff's injuries and surgery kept him out of work through the date of the hearings before the Deputy Commissioner. As of August 15, 2003, the date of the last hearing before the Deputy Commissioner, no physician had rated him. In fact, Dr. Carlson had referred him to a neurosurgeon for a workup concerning radicular pain that was then keeping plaintiff from working.
12. Plaintiff was fired on May 27, 2002, during a telephone discussion with Monica Holden, area supervisor for Sonic Drive-In. Monica Holden testified that she had not fired him, however, her testimony is found to be not credible.
13. The injuries suffered by plaintiff on March 10, 2002, and April 4, 2002, in the course and scope of his employment with Sonic were natural progressions of his compensable injury of December 21, 2001.
14. Dr. Carlton testified, and the Full Commission finds as fact, that the injuries for which he treated plaintiff were caused by the fall on the grease that plaintiff described. Part of Dr. Carlton's colloquy with counsel during deposition follows:
 Q And do you have an opinion satisfactory to yourself, to a reasonable degree of medical certainty, as to the cause of this AC joint injury?
 A Well, he gave an excellent, you know, mechanism of injury for this — for this problem he had, and it was consistent with his exam and consistent with his symptoms.
 Q And assuming the history he gave you is correct, did that — do you have an opinion as to whether that caused his AC joint injury?
 A It very well — it very well could have, I mean, based on what he told me about his history — I mean, his mechanism of injury.
 Q All right. And assuming he had no other trauma, do you have an opinion as to the cause of that AC joint injury?
 A With no other history of trauma or other mechanisms, then it would — I would say that it was related to his fall.
Q And is that your opinion?
A Yes.
Based upon the credible evidence presented, the Full Commission finds there was ample justification for Dr. Carlton's opinion as to causation.
15. On August 28, 2002, Dr. Carlton wanted plaintiff to have an MRI of his cervical spine to evaluate for any possible pathology in his neck that could be causing radicular symptoms down his arm. He also referred plaintiff to a neurosurgeon. On June 18, 2003, plaintiff returned to Dr. Carlton's office complaining of pain radiating across posteriorly from his neck, somewhat going down the medial side of his arm and into his small and ring fingers. The pain waxed and waned, being sometimes worse than other times, and cold air striking plaintiff's arm caused it to worsen. Dr. Carlton diagnosed a possible left arm radiculopathy and wrote plaintiff out of work because of the pain. There is no evidence of record subsequent to June 18, 2003, showing any ability of plaintiff to return to work
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury by accident within the course and scope of his employment, which constituted an unintended interruption of the work routine, when he slipped on grease, thereby falling and injuring his shoulder, back and neck. Cole v. GuilfordCounty, 259 N.C. 724, 131 S.E.2d 308 (1963); Taylor v. Twin City Club,260 N.C. 435, 132 S.E.2d 865 (1963); Hollar v. Montclair Furn. Co.,48 N.C. App. 489, 269 S.E.2d 667 (1980). The slipping and falling is the unusual, unforeseen occurrence, which is the accident. Taylor v. TwinCity Club, 260 N.C. 435, 132 S.E.2d 865 (1963).
2. Plaintiff's injury of December 21, 2001, was timely reported to his employer. Plaintiff's supervisor (who was also his wife) was present and witnessed the slip and fall. The employer reported the accident to the third party administrator on April 4, 2002. Notice to the employer is imputed to the third party administrator and carrier. N.C. Gen. Stat. §97-22.
3. Plaintiff's compensable injuries entitle him to medical compensation and temporary total disability compensation for the time he was unable to earn wages by reason of his injuries and subsequent treatment and surgery. N.C. Gen. Stat. §§ 97-2(19); 97-25; and 97-29.
4. Defendants are entitled to a credit for any employment compensation paid for periods during which plaintiff received workers compensation disability payments. N.C. Gen. Stat. § 97-42.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission makes the following:
 AWARD
1. Subject to the attorney's fees set forth below, defendant shall pay to plaintiff compensation at the rate of $248.64 per week from July 18, 2002, through August 28, 2002, and from June 18, 2003, until plaintiff is able to return to work. Defendants are entitled to a credit for any period between July 18, 2002, through August 28, 2002, and after June 18, 2003, for which plaintiff collected unemployment insurance.
2. Defendants shall pay to plaintiff's attorney twenty-five percent (25%) of all compensation due plaintiff.
3. Defendants shall pay, or reimburse those who paid, all medical bills in connection with plaintiff's compensable injuries of December 21, 2001, March 10, 2002, and April 4, 2002.
4. Defendants shall pay the costs.
This 14th day of January 2005.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER